In the Matter of Ronald L.
SPANGLER.

Gary GOLDSTEIN, Trustee for
Ronald L. Spangler

v.

ALEET LEASING ASSOCIATES II
and Citibank, N.A.

Bankruptcy No. 83–B–0849.
Civ. No. K–84–4350.

United States District Court,
D. Maryland.

Jan. 2, 1986.

Michael J. Schwarz and Schwarz and Greenblatt, Baltimore, Md., for appellant.

Stephen M. Goldberg and Weinberg & Green, Baltimore, Md., for appellees.

FRANK A. KAUFMAN, Chief Judge.

In August 1981, Ronald L. Spangler entered into a lease with Aleet Leasing Associates II (Aleet) for the rental for a term of fifty-eight months of a 1981 Rolls Royce Silver Spirit, an automobile purchased from, and delivered in Maryland to Spangler, by Gladding Rolls Royce (Gladding) of Glen Burnie, Maryland. At the same time, the parties executed a separate rider to that lease pursuant to which Spangler obtained an option to purchase the Silver Spirit for $17,620 at the end of the lease term, provided Spangler was not at such time in default under the lease. The lease required an initial payment by Spangler to Aleet of $7,007.73 and fifty-seven subsequent monthly payments of $2,335.91 each. Spangler took delivery of the Silver Spirit in the summer of 1981 in Maryland. The car was garaged by Spangler in Maryland until January 1983. The lease, in paragraph 3, states: "Lessee represents vehicle will be principally operated and garaged in the State of Maryland." In paragraph 10, the lease requires that the lessor "register [the] vehicle in conformity with the laws of the state in which the lessee represents it will be principally operated and garaged...." In 1981, Aleet and Spangler

registered and titled the vehicle in the State of New York, seemingly by their joint agreement and perhaps, though the record is not clear, also with the agreement of Citibank. The State of New York certificate of title was issued in 1981 in Aleet's name.

In order to finance the purchase of the car, Aleet obtained a loan from Citibank. Aleet gave Citibank a security interest in the vehicle which was noted on the title. Both Aleet and Citibank are New York entities. Spangler is a resident of Maryland.

In July 1983, Aleet and Spangler entered into an agreement, pursuant to which, in effect, the lease and the option were amended to substitute for the Silver Spirit another vehicle, a Rolls Royce Corniche Convertible. Counsel for both sides, during the pendency of the within appeal, informed this Court that Gladding purchased that vehicle for $60,000 from a corporation within the control of Spangler and then sold it to Aleet. The Corniche was, at that time, registered and titled by Aleet and Spangler in the State of New York with the certificate of title again being issued indicating Aleet as the owner and Citibank being noted in the title as the lienholder. Thereafter, at all pertinent times, the vehicle was garaged in Maryland. The record does not disclose how or where the Corniche was titled and garaged prior to the said substitution in January 1983.

Subsequently, Spangler instituted Chapter 7 proceedings in the Bankruptcy Court of this district. During those proceedings, Aleet objected to the sale of the Corniche by the trustee, whereupon the trustee instituted a separate action against Aleet and Citibank contending (a) the lease was a disguised security agreement; (b) Aleet's security interest was unperfected; and (c) alleged preferential payments had been made to Aleet by Spangler. The Bankruptcy Court consolidated the trustee's action with the objections to the sale filed by Aleet and Citibank. During a hearing on October 19, 1984, the Bankruptcy Court, without making specific underlying findings, concluded that the agreement was a lease, dismissed the trustee's action, and upheld the objections of Aleet and Citibank.

■ Bankruptcy Rule 7052 requires the Bankruptcy Court to apply Federal Rule of Civil Procedure 52 in adversary proceedings. Civil Rule 52(a) calls upon a federal district court to make and to set forth specific findings of fact and conclusions of law. Under Bankruptcy Rule 8013, the District Court, on appeal from the Bankruptcy Court, may, when appropriate, "remand with instructions for further proceedings." If the findings of the Bankruptcy Court are made in conclusory fashion and the record below does not permit meaningful review, a remand by the district court for further proceedings may be in order. *Watson v. Thompson*, 456 F.Supp. 432, 436 (S.D.Ga.1978).

If the August 1981 and January 1983 transactions involved leasing rather than selling, then Aleet is the owner of the vehicle, Citibank is a lienholder, and the trustee has no interest in the vehicle. If, on the other hand, those transactions constitute, in legal effect, a sale, the trustee is the owner of the Corniche, Aleet obtained a security interest in that vehicle which may or may not have been perfected, and Citibank is an assignee of whatever interest Aleet may have obtained and perfected. Furthermore, even should Aleet and Citibank hold a perfected security interest, there may or may not be sufficient equity in the vehicle fully to satisfy the respective claims of one or both of them, with the remaining equity, if any, belonging to the bankruptcy estate.

The record discloses the following:

| | Silver Spirit | Corniche |
|---|---|---|
| Total Rentals | $ 140,154.60 | $ 140,154.60 |
| Purchase Price | 98,101.00 | 60,000.00 |
| Projected value at end of lease term [1] | 45–50,000.00 | 50–60,000.00 |
| Sale Price [2] | 62,000.00 | 57,500.00 [3] |

The following calculations of percentages of certain values to the purchase option price are relevant:

| | Silver Spirit | Corniche |
|---|---|---|
| Total Rentals | 12.57% | 12.57% |
| Purchase Price | 17.96% | 29.37% |
| Projected Value | 39.16 – 35.24% | 35.24 – 29.37% |
| Sale Price | 28.42% | 30.64% |

### Sale or Lease

Paragraph 14 of the August 1981 agreement calls for the application of New York law.[4] The Uniform Commercial Code (U.C. C.), as adopted by Maryland, permits the parties to select the law of any state "when the transaction bears a reasonable relation" to such state and thereby to "agree" that the law of such other state "shall govern their rights and duties." Md. Com.Law Code Ann. § 1–105(1) (1984).[5] Thus the parties' agreement that New York law governs would require this Court herein to apply New York law in order to determine whether a lease or a sale is involved if the transaction involved herein bears a reasonable relation to the State of New York. The record in this case is rather sparse in disclosing facts relative to that condition. Thus, on remand, perhaps that factual issue should be further explored. However, in any event, the question of which law governs that issue is seemingly of relatively little importance since New York and Maryland law on that point are relatively similar. See the Maryland and New York cases cited *infra*.

**1.** The projected values are based upon estimates stated by Spangler on October 19, 1984 during testimony. They may or may not represent fair market values.

**2.** The Silver Spirit was sold for $62,000 following the substitution of the Corniche.

**3.** The Corniche sale price of $57,500 was negotiated by the trustee in the attempted sale by the trustee to which Aleet and Citibank objected. It may or may not be an appropriate reflection of fair market value.

**4.** That paragraph reads as follows, in pertinent part: "This lease shall be interpreted in accordance with the laws of the State of New York."

### Lease vs. Sale

The basic guideline for determining when a lease is, in legal effect, a security agreement is set forth in U.C.C. section 1–201(37), which provides, in part:

Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' but a consignment is in any event subject to the provisions on consignment sales (§ 2–326). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

A number of factors have been looked to by the courts in applying section 1–201(37) to specific factual situations. *See, e.g., In re Alpha Creamery,* 4 U.C.C.Rep.Serv. 794 (Bankr.W.D.Mich.1967), cited and followed by Chief Judge Hammond in *Crest Investment Trust, Inc. v. Atlantic Mobile Corporation,* 252 Md. 286, 288, 250 A.2d 246 (1969).

Whether an agreement is a lease or sale requires, at the threshold, a determination of the intent of the parties to the transaction. *See Crest,* 252 Md. at 289, 250 A.2d 246; *In re O.P.M. Leasing Services, Inc.,* 23 B.R. 104, 115–116 (Bankr.S.D.N.Y. 1982). Reservation of title, in and of itself, does not necessarily mean that a sale is intended. *Crest,* 252 Md. at 289, 250 A.2d

**5.** Section 1–105(2) of the Uniform Code, as adopted by Maryland, provides that when the governing law is to be determined by one of several listed sections including section 9–103, "a contrary agreement is effective only to the extent permitted by the law (including the conflict of law rules) so specified." Section 9–103 governs the law applicable to questions of perfection of a security interest in connection with certain multistate transactions, and does not relate to the question of whether the transaction in question was a lease or a security agreement—a question which goes to the nature of the transaction.

246. However, when the insurance, default, and remedy provisions resemble those in a typical security agreement, that may dictate the conclusion that a sale is intended. *See International Paper Credit Corp. v. Columbia Wax Products Co.*, 102 Misc.2d 738, 424 N.Y.S.2d 827 (Sup.Ct. 1980), *rev'd on other grounds*, 79 A.D.2d 700, 434 N.Y.S.2d 270 (1980). Further it is relevant to look at such facts as the purchase option price as compared to the aggregate of the rental, the list price, the capital cost, and the fair market value of the collateral at the end of the lease term. In *In re Oak Manufacturing, Inc.*, 6 U.C. C.Rep.Serv. 1273 (Bankr.S.D.N.Y.1969), an agreement was held to constitute a sale with reservation of a security interest in an instance in which the purchase option price under the lease was 9% of the aggregate rentals and 13% of the fair market value of the goods at the end of the lease. *Id.* at 1277. *See also National Equipment Rental v. Priority Electronics*, 435 F.Supp. 236, 239 (E.D.N.Y.1977) in which Judge Platt, applying New York law, noted, *inter alia*, the total rentals exceeded the purchase price by 46% under one agreement and 30% under another and concluded that a security interest and not a true lease was intended; *In re Washington Processing Co.*, 3 U.C.C.Rep.Serv. 475 (Bankr.S.D. Cal.1966), in which the purchase option was less than 10% of aggregate rentals and between approximately 13% and 18% of fair market value, *id.* at 477, and in which Referee Kinnison held that the agreement was a sale and that the parties intended to create a security interest, *id.* at 478; *Crest*, 252 Md. at 289, 250 A.2d 246, in which Chief Judge Hammond suggested that if the lease option price is less than 25% of the list price of the goods, the parties intended the agreement as one for security; *Rebhun v. Executive Equipment Corp.*, 90 Misc.2d 576, 394 N.Y.S.2d 792 (Sup.Ct. 1977), in which the option price was 18.2% of the aggregate of the rentals and 20% of the capital cost, and in which Justice Pittoni held that that amounted to more than nominal consideration and that the agreement was a lease; *O.P.M. Leasing Services*

*Inc. v. Homestead Fabrics, Inc.*, 18 U.C.C. Rep.Serv. 1342, 1344 (N.Y.Sup.Ct.1976) in which Justice Baer considered, *inter alia*, the fact that "the total rentals for the lease term approximated the cost of the equipment plus interest," in determining that a sale was intended. For a general discussion of the factors considered by the courts in determining whether lease or sale is intended, *see generally* J. White & R. Summers, Uniform Commercial Code § 22–3 (2d ed. 1980); Secured Transactions, 53 N.Y. Jur. & §§ 28, 46 (1967 & 1984 Supp.)

■ In the within case, if the purchase price of the Silver Spirit is considered as the list price, the option price constitutes 17.96% of the list price. Spangler testified that the list price of the Silver Spirit was actually approximately $109,000.[6] Using that figure as the list price, the purchase option price represents 16.16% thereof. The purchase option price constitutes 29.37% of the purchase price of the Corniche, but no evidence was adduced in the Bankruptcy Court as to the actual list price of the latter. The option price constitutes 12.57% of the aggregate of the rentals, a figure larger than that in *Oak Manufacturing*, but considerably smaller than that in *Rebhun*. The present record contains minimal evidence with regard to the probable value of the vehicles at the end of the lease term. The sale of the Silver Spirit in fact took place prior to the end of the lease term. The sale price of the Corniche is the one value the trustee in bankruptcy negotiated. If those sale prices are assumed to be fair market values at the end of the lease term, the option price constitutes between 28.4% and 30.6% of the end of term fair market value. If Spangler's testimony as to the projected values is accepted, the option price is between 29.4% and 39.1% of those values. In either case, the figures for this case are considerably higher than in the *Oak Manufacturing* or *Washington Processing* cases. Thus, comparison of the purchase option to the list price or to the aggregate rentals of the vehicles suggests that the transactions *in toto* may be sale,

**6.** Tr. of hearing in Bankruptcy Court at 23.

while comparison to the fair market value suggests that they may be lease.

Under the circumstances, in view of the absence of specific factual analyses and determinations by the Bankruptcy Court, a remand to that court is required. On remand, the Bankruptcy Court shall take such further evidence, if any, as it believes is required in accordance with the guidelines set forth in this opinion, and shall then make specific findings of facts and enter a final holding as to sale versus lease.

### Perfection of Security Interest

"Owner", as used in reference to a vehicle:

(1) Means a person who has the property in or title to the vehicle;

(2) Includes a person who, subject to a security interest in another person, is entitled to the use and possession of the vehicle; and

(3) Does not include a lessee under a lease not intended as security.

Md.Transp.Code Ann. § 11–143 (1984).

The New York statutory definition of owner is substantially the same. It provides:

"Owner" means a person, other than a lienholder, having the property in or title to a vehicle. The term includes a person entitled to the use and possession of a vehicle subject to a security interest in another person, but excludes a lessee under a lease not intended as security.

N.Y.Veh. & Traf.Law § 2101(g) (1984). Thus, if a sale is involved, Spangler is seemingly the owner whether Maryland or New York law applies, and the Bankruptcy Court will be required to determine whether Aleet and Citibank together hold a perfected or unperfected security interest.

The trustee contends that the Maryland Transportation Code governs the question of perfection, and that under that statute, Aleet's security interest is unperfected. Transportation Code section 13–101.1 states that "[e]xcept as provided in § 13–102 of this subtitle, the owner of each vehicle that is in this State and for which the Administration has not issued a certificate of title shall apply to the Administration for a certificate of title of the vehicle." The only exception in section 13–102 con-

ceivably applicable to this case is subsection (4), which exempts vehicles "owned by a nonresident" and "not required to be registered" in Maryland. That exception, however, is inapplicable herein, because the "owner," as that term is defined in both the New York and the Maryland statutes, is a resident of the State of Maryland.

If the vehicle is required to be titled under section 13–101.1, section 13–202 prescribes the procedure for perfecting a security interest. Md.Transp.Code Ann. § 13–207. Section 13–202 provides:

(a) *Security interest not valid unless perfected.*— Unless excepted by § 13–201 of this subtitle, a security interest in a vehicle is not valid against any creditor of the owner or any subsequent transferee or secured party unless the security interest is perfected as provided in this subtitle.

(b) *Manner and time of perfection; fee.*—(1) A security interest is perfected by:

(i) Delivery to the Administration of every existing certificate of title of the vehicle and an application for certificate of title on the form and containing the information about the security interest that the Administration requires; and

(ii) Payment of a filing fee of $12, which is in addition to any other fees that apply under the Maryland Vehicle Law.

(2) The security interest is perfected at the time of its creation, if the delivery and payment to the Administration are completed within 10 days of the date of its creation. Otherwise, the security interest is perfected at the time of the delivery and payment.

(c) *Prior security interest on vehicle brought into State from another jurisdiction.*—(1) If a vehicle already is subject to a security interest when brought into this State, the validity of that security interest in this State is determined by the law (including the conflict of law rules) of the jurisdiction where the vehicle was located when the security interest attached, subject to the provisions of this subsection.

(2) If, at the time the security interest attached, the parties to the transaction understood that the vehicle would be

kept in this State, and if, within 30 days after the security interest attached, the vehicle was brought into this State for purposes other than transportation through this State, the validity of the security interest in this State is determined by the law of this State.

(3) If, before the vehicle was brought into this State, the security interest already was perfected under the laws of the jurisdiction where the vehicle was located when the security interest attached, the following rules apply:

(i) If the name of the secured party is shown on an existing certificate of title issued by that jurisdiction, the security interest continues perfected in this State; and

(ii) If the name of the secured party is now shown on an existing certificate of title issued by that jurisdiction and if the law of that jurisdiction does not provide for certificates of title disclosing security interests, the security interest continues perfected in this State for 4 months and thereafter if, within the 4-month period, it is perfected in this State, but this security interest also may be perfected in this State after the expiration of the 4-month period, in which case perfection dates from the time of perfection in this State.

(4) If, before the vehicle was brought into this State, the security interest was not perfected under the law of the jurisdiction in which the vehicle was located when the security interest attached, it may be perfected in this State, in which case perfection dates from the time of perfection in this State.

(d) *Duplicate of security interest filing.*—A secured party under this subtitle may obtain from the Administration a duplicate of the security interest filing as provided in § 13–953 of this title.

Md.Transp.Code Ann. § 13–202 (1984). It is undisputed that the provisions of subsection (b) were not complied with; accordingly, the trustee argues that the security interest is unperfected.

Aleet does not contend that its interest is perfected under subsection 13–202(c). Rather, Aleet asserts that under U.C.C.

section 9–103(2), as adopted by Maryland, the question of perfection is governed by New York law. That section provides:

(a) This subsection applies to goods covered by a certificate of title issued under a statute of this state or of another jurisdiction under the law of which indication of a security interest on the certificate is required as a condition of perfection.

(b) Except as otherwise provided in this subsection, perfection and the effect of perfection or non-perfection of the security interest are governed by the law (including the conflict of laws rules) of the jurisdiction issuing the certificate until four months after the goods are removed from that jurisdiction and thereafter until the goods are registered in another jurisdiction, but in any event not beyond surrender of the certificate. After the expiration of that period, the goods are not covered by the certificate of title within the meaning of this section.

(c) Except with respect to the rights of a buyer described in the next paragraph, a security interest, perfected in another jurisdiction otherwise than by notation on a certificate of title, in goods brought into this state and thereafter covered by a certificate of title issued by this state is subject to the rules stated in paragraph (d) of subsection (1).

(d) If goods are brought into this state while a security interest therein is perfected in any manner under the law of the jurisdiction from which the goods are removed and a certificate of title issued by this state and the certificate does not show that the goods are subject to the security interest or that they may be subject to security interests not shown on the certificate, the security interest is subordinate to the rights of a buyer of the goods who is not in the business of selling goods of that kind to the extent that he gives value and receives delivery of the goods after issuance of the certifi-

cate and without knowledge of the security interest.

Md.Com.Code Ann. § 9–103(2) (1984).

In this case, the reason why the vehicles were titled in New York apparently was "[t]o save taxes." [7] Whether, in the factual context of this case, section 9–103(2) overrides the provisions of Transportation Code section 13–202(b) poses a difficult question. Some courts have given section 9–103(2) an expansive reading, so as to displace state titling rules whenever the state issuing the title has even a remote (or perhaps no) connection with the transaction. For example, in *In re Paige*, 679 F.2d 601 (6th Cir.1982), the debtor, Paige, was a resident of Michigan who worked for an interstate hauling company, with a business office in Illinois. Paige purchased a truck tractor in Indiana, with the seller retaining a security interest. The truck was titled in Illinois, and Paige's address was given as his employer's Illinois address. Applying section 9–103(4), the 1962 Code version of the present 9–103(2), Judge Merritt, after commenting that "[a] literal reading of section 9–103(4) indicates that it should be applied whenever a certificate of title is issued by a foreign jurisdiction which as a condition of perfection requires notation of the security interest on the certificate," *id.* at 602, wrote that "[t]he advantage of a literal interpretation of section 9–103(4) is that a potential creditor need only look to one place—the certificate of title—to discover priority security interests." *Id.* at 603. Accordingly, Judge Merritt rejected the lower court's view that the title to the security interest, noted in Illinois, was not perfected under Michigan law, because the issuing state, i.e. Illinois, not only had to require notation of a security interest on the certificate of title, but also had to be the state of the debtor's (Paige's) chief place of business, which was Michigan, not Illinois. *Id. See also In re Angier*, 684 F.2d 397, 399 (6th Cir.1982); *General Motors Acceptance Corp. v. Whisnant*, 387 F.2d 774 (5th Cir.1968); *In re Dixon*, 29 B.R. 304 (Bankr.S.D.Ill.1983); *In re Crosby*, 23 B.R. 514 (E.D.Tenn.1982).

Those cases can perhaps be read, and Aleet, in fact, so urges, to require that whenever a foreign jurisdiction issues a certificate of title, the question of whether there is a perfected security interest is always governed by the law of the issuing state. In support of that view, it has been asserted that "[t]he word 'covered' [in section 9–103(2) ] poses interpretive problems. Some say it means only 'within jurisdictional reach,' so that even though a state issued a certificate, the section does not apply unless the state also had jural power to do so. We agree with the contrary view that 'covered' requires only that a certificate in fact be issued." J. White & R. Summers, *supra*, at 977 n. 286 (citations omitted).

That expansive reading of section 9–103(2) is seemingly also supported by a reading of the official comments to the U.C.C. Comment 4 to section 9–103(2) states:

> Where the collateral is an automobile or other goods covered by a certificate of title issued by any state and the security interest is perfected by notation on the certificate of title, perfection is controlled by the certificate of title rather than by the law of the state wherein the security agreement attached.... In theory the certificate of title should control the property wherever the vehicle may be.

U.C.C. § 9–103 comment 4(a) & (b). *See also* U.C.C. § 9–103, Reasons for 1972 Change (1972), which states that

> [t]he basic rule of this section is that the controlling law ... is the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security agreement is perfected or unperfected (paragraph (1)(b)). There are certain exceptions: ... (ii) Where the collateral is covered by a certificate of title, perfection will be governed by the law of the issuing jurisdiction (subsection (2)).

And see the following views expressed in *Paige* by Judge Merritt:

---

7. Tr. of hearing in Bankruptcy Court at 50.

In *Brown, supra,* [5 U.C.C.Rep.Serv. 401 (Bankr.W.D.Mich.1968),] Judge Nims (then Referee Nims) addressed section 9–103(4) and the notice policy of Article 9. He stated:

> If we read the statute literally, a trucker could pick any state in which to obtain his title and one searching the records would only be safe if he checked each of fifty states.... But if notice is a governing factor of the UCC, notice must be given where it can be reasonably found and not hidden from the world because of misrepresentations of the debtor....

5 U.C.C.Rep. at 407.

*In re Dawson,* 21 U.C.C.Rep. 293 (E.D. Mo.Bankr.1976) considered and rejected Judge Nims's reasoning based upon the notice principles of the UCC noting that section 9–103(4)

> is applicable only when a title is issued by a state whose laws require, in order to perfect a lien on a motor vehicle, that the lien be noted on the title. Laws providing for the registration and titling of vehicles are now, and have been for some time, commonplace, and prospective lenders are generally aware of their existence. Any such lender, preparing to extend credit to the owner of a vehicle used in multistate commerce (if the ownership, and the value, of the vehicle are important factors in the credit transaction), will most assuredly ask his prospective debtor for his registration and title papers to such a vehicle, and begin his credit investigation, in respect of liens, in the certificating state.... This, it seems to me, is what § 9–103(4) comprehends, a scheme in accordance with and not incompatible to the notice concepts of the UCC. 21 U.C.C.Rep. at 299. We find the reasoning in the *Dawson* case to be persuasive. As the *Dawson* case reveals, a literal application of section 9–103(4) does no real harm to the notice policy of the UCC. Moreover, a loose interpretation of section 9–103(4), as preferred by Judge

Nims, does some violence to the values of certainty which the UCC was intended to promote. The introduction of a standard which requires the certificating state to be the state of the debtor's chief place of business may case uncertainty on the perfection of security interests in vehicles used in more than one jurisdiction. The advantage of a literal interpretation of section 9–103(4) is that a potential creditor need look only to one place—the certificate of title—to discover prior security interests. If the debtor cannot or will not produce the title certificate the potential creditor is immediately on notice that he acts at his own risk.

*Paige,* 679 F.2d at 603.

Several courts and commentators have, however, given a narrower reading to section 9–103(2) than suggested by the authorities reviewed *supra.* This has basically been done in one of two ways: first, by requiring that the issuing state have power to issue the certificate;[8] and second, by holding that in order for section 9–103(2) to apply, the security interest must have attached prior to the entrance of the vehicle into the nonissuing state.

The basis for the first of those approaches, i.e., the requirement of power, has been stated as follows:

> [T]he certificate must have been issued, although the subsection does not say so, by a 'jurisdiction' which had power to do so; if the state of Saskatchewan or the principality of Lichtenstein issues a certificate of title covering a truck owned by a debtor whose chief place of business is in Massachusetts (a Code state) and if the truck has never been operated in Saskatchewan or Lichtenstein, then the purported 'certificate of title' is merely waste paper and nothing in § 9–103(4) [of the 1962 Code] gives it any 'jural significance.' The certificate of title must then be 'validly' issued, but nothing in the Code casts any light on 'validity.'

---

**8.** Indeed, it is not clear that *Paige* eliminates the power requirement. *See* 679 F.2d at 603 ("Apparently Illinois had the power or authority to issue the certificate").

I G. Gilmore, Security Interests in Personal Property § 10.10 at 327 (1965). In *In re Trivett*, 12 B.R. 373 (Bankr.E.D.Tenn.1981), the court wrote that "[t]he statute appears to say that perfection under the certificate of title law of any state is effective in Tennessee without regard to whether the property was subject to the laws of the other state. If read that way, the subsection would be an unusual conflict of laws rule.... Subsection (4) [of the 1962 Code version of 9–103] should be read to mean that 'the certificate must have been issued ... by a "jurisdiction" which had power to do so.'" *Id.* at 381 (quoting *Gilmore, supra*).[9]

Several courts have held that if the following events occur in one state, namely, (1) purchase of the vehicle, (2) completion of the sale, (3) execution of the security agreement, and (4) attachment of the security interest, those factors "are sufficient to hold that perfection is governed by the law of that state." *In re Canter*, 8 U.C.C.Rep. Serv. 252, 256 (Bankr.E.D.Tenn.1970). *See also In re Antonuzzio*, 20 U.C.C.Rep.Serv. 180, 185 (Bankr.E.D.N.Y.1976). In this case, all of the relevant factors relating to power of a state, which are presently shown by the record, apparently point to Maryland and not to New York, except for the fact that Aleet and Citibank are New York entities.

There is also, as indicated *supra,* some suggestion in the case law that in order for section 9–103(2) to be applicable, the security interest must at least have attached to the vehicle while the vehicle was in issuing state. *See, e.g., First National Bank & Trust Co. of Norman, Oklahoma v. Jim Payne Pontiac GMC, Inc.*, 20 U.C.C.Rep.Serv. 768 (Okla.Ct.App.1976), in which the court noted: "Here there was no security interest involved until after the vehicle was in Oklahoma. Therefore, Oklahoma procedures as to perfection must control." *Id.* at 776.[10]

In sum, on the one hand, the recent trend of authority, the policy concerns noted by, for example, Judge Merritt in *Paige*, and the official comments, all suggest giving section 9–103(2) an expansive reading pursuant to which the law governing perfection is that of the state issuing the certificate of title, i.e. herein, New York. On the other hand, the requirements of power and prior attachment suggest a narrower reading of section 9–103(2), and an expansive reading of that section would, as for instance in this case, seemingly permit the parties to avoid the Maryland Transportation Code at will, by titling the vehicle in another state. Maryland Transportation Code section 13–101.1 requires that, subject to certain exceptions, "the owner of every vehicle that is in this state ... shall apply to the Administration for a certificate of title of the vehicle." Spangler, as the owner under the Transportation Code, was therefore seemingly required to obtain a Maryland title. Section 13–202(a) provides that the security interest shall not be "valid as against any creditor of the owner or any subsequent transferee or secured party unless the security interest is perfected as

---

**9.** It may be that New York law itself would prohibit the issuance of title in the factual circumstances of the within case. As discussed *supra,* under both Maryland and New York law, if the transaction is found to be one for security and not a true lease, the owner of the vehicles seemingly was Spangler and not Aleet. New York Vehicle and Traffic Law § 2102(a)(3) excludes from coverage by that law "[a] vehicle owned by a nonresident and not required to be registered in this state." Section 2102(d) further provides that "[n]o certificate of title shall be issued to a vehicle excluded from the provisions of this article." *See also* N.Y. Veh. & Traf. Law § 250. In this case, Spangler is a nonresident, with his vehicle garaged outside New York. Thus, New York may have been without power to issue the certificate of title.

**10.** The question therefore arises as to whether section 9–103(2) applies only or principally when a vehicle is brought into Maryland from another jurisdiction, not in an instance in which the vehicle is at all relevant times within Maryland. In that regard, subsection (2)(b) provides in part, that perfection is "governed by the law ... of the jurisdiction issuing the certificate until 4 months after the goods *are removed* from that jurisdiction...." (Emphasis added.) Subsections (2)(c) and (d) likewise refer to "goods *brought into* this State." (Emphasis added.) The language of section 9–103(2) thus may be principally directed at the problem of interstate removal of goods, not to a situation in which the goods are within a single jurisdiction, other than the title issuing state, at all relevant times, as is the case herein.

provided in this subtitle." Both of these Maryland statutory provisions would appear to be rendered nugatory by the application of New York law through section 9–103(2).

On remand, the Bankruptcy Court, even if it holds a lease is involved, should nevertheless assume *arguendo* that a sale is involved, and decide, in the light of the within opinion, the perfection of security interest issue discussed *supra* as the Bankruptcy Court believes that the Court of Appeals of Maryland would decide that question in the factual context of this case.[11] *See generally* 1A *Moore's Federal Practice* ¶ 0.309[2] (2d ed. 1985). By so doing, the Bankruptcy Court will decrease the possibility of this case continuing to march up and down the hills between itself, this Court, and one or more superior appellate tribunals. In connection with the Bankruptcy Court's task on remand with regard to the perfection of the security interest issue, it is to be noted that "[w]here two statutes deal with the same subject matter, as here, they must be construed together if they are not inconsistent with one another. Thus, to the extent possible, full effect should be given to each. This is true even if the statutes have been enacted at different times, with no reference to each other, in which case the rule is that the statutes must be harmonized to the extent possible." *Smelser v. Criterion Insurance Co.,* 293 Md. 384, 389, 444 A.2d 1024 (1982).[12]

---

**11.** On remand, whether the Bankruptcy Court holds a sale or a lease is involved, that Court should also determine the preferential payment issue raised by the trustee. See the discussion in the body of this opinion at page 3 *supra.*

**12.** Aleet and Citibank contend that regardless of the determination of any and all other issues in this case, they are entitled to judgment herein under *In re Hartman,* 745 F.2d 307 (4th Cir. 1984). In that case, Hartman purchased certain land subject to a deed of trust which was acknowledged by Hartman before a notary public who was the same person as the trustee. "[U]nder West Virginia law ... a deed of trust acknowledged by the grantor before a trustee, acting as a notary, is valid as between the parties to the instrument 'or those purchasing with actual notice,' but invalid as against all judgments and all subsequent bona fide purchasers for value." *Id* at 309. Hartman, after filing for bankruptcy in a Chapter 11 proceeding, became a "debtor in possession" of the property. Claiming that among his powers as the debtor in possession was the power to avoid any lien or interest which a trustee could avoid, Hartman asserted that he could avoid the deed because, as debtor in possession, he was the same as a bona fide purchaser for value. Judge Ervin, writing for himself and Judge Phillips, held, over a dissent by Chief Judge Winter, that under West Virginia law, a subsequent purchaser for value only succeeds against an improperly acknowledged deed if the purchaser took action without notice and that Hartman, even in his capacity as debtor in possession, was not such a person. Aleet and Citibank take the position that Spangler had notice of the leasing arrangements, and that the trustee herein is bound by that knowledge. However, even assuming, *arguendo* only, that Maryland law includes notice principles applicable herein of the type present in *Hartman* under West Virginia law, there is not, in this case, the same type of identity between the trustee representing creditors and Spangler, as there was between Hartman, the grantor, and Hartman, the debtor in possession. Also, constructive notice to the creditors of Spangler, because of the notation on the New York certificate of title and/or the New York recordation is hardly the type of notice involved in *Hartman.* Accordingly, on the record before this Court, *Hartman* would appear of little aid to Aleet or to Citibank.